J-S59031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3467 EDA 2017 |

Appeal from the Decree September 28, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000506-2017

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 1, 2018**

Appellant, E.H. ("Mother"), appeals from the September 28, 2017 decree, in the Court of Common Pleas of Philadelphia County, involuntarily terminating her parental rights to her son, A.M.S., born in December of 2013.[1] Upon review, we affirm.

We summarize the relevant facts and procedural history, as follows. The Department of Human Services ("DHS") received a report involving this family in November of 2015, alleging that Mother used drugs; that she ran outside of her apartment building unclothed; and that A.M.S. was found inside the apartment building running in the hallway, naked and unsupervised.  Trial

_____

[1] By separate decrees dated September 28, 2017, and entered on October 2, 2017, the trial court involuntarily terminated the parental rights of M.S. ("Father") and of any unknown father.  Neither Father nor any unknown father has filed a notice of appeal.

Court Opinion, 5/2/18, at 1. Community Umbrella Agency ("CUA") Wordsworth implemented in-home services shortly thereafter. *Id.* at 2.

On August 21, 2016, DHS received another report alleging that Mother was admitted to the hospital after suffering a deep laceration on her leg that was approximately five or six inches long. *Id.* at 2. Further, the report alleged that Mother had drug paraphernalia in her possession; she appeared to have needle marks on her body; and she had soiled herself. *Id.* The report alleged that Mother was diagnosed with substance abuse and psychosis. *Id.* In addition, the report alleged that Father took physical custody of A.M.S. *Id.* Father was then residing with the paternal great-grandmother of A.M.S. *Id.*

On September 7, 2016, DHS received a report alleging that, on September 5, 2016, Father had sexually abused A.M.S. in their home and was under investigation by the Special Victims Unit. *Id.* at 2. In November of 2016, Father pleaded guilty to the criminal charges of corrupting a minor and indecent exposure. N.T., 9/28/17, at 9; DHS Exhibit 2.

Further, on September 7, 2016, DHS learned that A.M.S. was suffering from ringworm on his torso and bedbug bites. Trial Court Opinion, 5/2/18, at 3. DHS obtained an order of protective custody on that date and placed him in a foster home. *Id.* The trial court adjudicated A.M.S. dependent on September 15, 2016. *Id.*

Permanency review hearings occurred on December 8, 2016, February 23, 2017, and May 18, 2017. *Id.* at 3; DHS Exhibit 5. A.M.S.'s placement goal was reunification with Mother. Mother was required to comply with single

case plan objectives including participating in mental health treatment, drug and alcohol treatment, and court-ordered drug screens; attending the Sage program, a program for parents of children who have been molested; and completing a parenting capacity evaluation. N.T., 9/28/17, at 24-25.

On May 3, 2017, DHS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (4), (5), and (b). A hearing occurred on September 28, 2017,[2] during which DHS presented the testimony of Monaque Riddick, a case manager at CUA Wordsworth, and Erica Williams, Ph.D., a psychologist, who performed a parenting capacity evaluation on Mother. Mother, who was represented by court-appointed counsel, testified on her own behalf.[3]

By decree dated September 28, 2017, and entered on October 2, 2017, the trial court involuntarily terminated Mother's parental rights pursuant to 23

---

[2] The subject proceeding was a combined goal change and involuntary termination hearing. The trial court subsequently issued an order changing A.M.S.'s placement goal to adoption, but Mother did not appeal from that order.

[3] A.M.S., who was then three years old, had the benefit of legal counsel as well as a guardian *ad litem* ("GAL") during the proceeding. ***See In re T.S.***, __ A.3d __, 2018 WL 4001825 at * 1 (Pa. 2018) (citing ***In re Adoption of L.B.M.***, 161 A.3d 172, 174 (Pa. 2017) (concluding that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, which our Supreme Court has defined as a child's preferred outcome.)

Pa.C.S. § 2511(a)(1), (2), (4), (5), and (b).[4]  On October 25, 2017, Mother

timely filed and served a notice of appeal and a concise statement of errors

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]  The

trial court filed an opinion pursuant to Rule 1925(b) on May 2, 2018.

On appeal, Mother raises the following issues for our review, which we

have re-ordered for ease of disposition:

> 1.   Whether the [t]rial [c]ourt abused its discretion and erred
> in law when Mother's request for a continuance was denied?
>
> 2.   Whether the [t]rial [c]ourt erred when it refused to accept
> Mother's evidence of surgeries and medications?
>
> 3.   Whether the trial court abused its discretion and erred [in]
> law when Mother was not given [a] reasonable amount of time to
> complete objecti[v]es?
>
> 4.   Whether the trial court abused its discretion and erred in
> law when Mother's visits were suspended and she was not a
> danger to A.M.S.?
>
> 5.   Did . . . [DHS] sustain the burden that Mother's rights should
> be terminated when there was evidence that Mother had

---

[4] The trial court entered an amended decree on October 2, 2017, involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).

[5] On June 5, 2018, Mother's counsel filed a motion requesting a 30-day extension to file an appellant's brief.  Further, counsel requested that her representation be vacated if this Court denied the extension.  On June 8, 2018, this Court denied the motion for a 30-day extension and remanded to the trial court for a determination as to whether Mother is still eligible for court-appointed counsel and, if so, for the appointment of new counsel.  On June 28, 2018, the trial court appointed Mario D'Adamo, III, as new appellate counsel for Mother.

completed and/or had been actively completing her permanency goals?

Mother's brief at 9.

In her first issue, Mother argues that the trial court abused its discretion in failing to grant her counsel's request for a continuance due to being provided the parenting capacity evaluation on the day of the subject proceeding and, as a result, not having the opportunity to review it. We disagree.[6]

Our Supreme Court has stated:

> Appellate review of a trial court's continuance decision is deferential. "The grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. As we have consistently stated, an abuse of discretion is not merely an error of judgment. Rather, discretion is abused when 'the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record. . . .'"

***Commonwealth v. Brooks***, 104 A.3d 466, 469 (Pa. 2014) (citations omitted).

At the beginning of the hearing, before the testimonial evidence commenced, Mother's counsel made a request for a continuance because, in part, "the [parenting capacity] evaluation was just received." N.T., 9/28/17,

---

[6] We observe that the trial court had continued the termination hearing once before. The subject proceeding occurred four months after DHS filed the petition, and A.M.S. had been in placement for more than one year.

at 4. In response, counsel for DHS stated that she received the report "in the middle of the list, . . ., and I have not read it. So I am as unaware of the circumstances of everything that's written down. . . ."[7] N.T., 9/28/17, at 14. Further, counsel responded that Dr. Williams is present to testify and available for cross-examination by Mother's counsel. *Id.* at 14. Moreover, counsel responded that she would prove Mother's conduct warrants termination of her parental rights because she has failed to comply with her required objectives, which is a basis separate and apart from the parenting capacity evaluation. *Id.* at 13-14.

In denying Mother's request for a continuance, the trial court explained:

> Counsel for [DHS] must meet their burden of proof. . . . [Y]ou will have an adequate opportunity to cross examine.
>
> If . . . a possible finding of termination of parental rights [i]s only through the parenting capacity evaluation, then I would think that they would agree with your continuance. . . . I am going to allow [DHS's counsel] to go forward [to prove her case].

*Id.* at 15-16.

We discern no abuse of discretion. Indeed, Mother's counsel cross-examined Dr. Williams. Dr. Williams testified that her recommendations for Mother were consistent with her court-ordered objectives. N.T., 9/28/17, at

---

[7] In its brief, DHS clarified that all of the parties received the evaluation at the same time as Mother's counsel; therefore, none of the parties had an opportunity to review it prior to the proceeding. DHS's brief at 34.

59. Our review of the record reveals that Mother's requisite objectives were in effect since approximately September of 2016. Ms. Riddick, the CUA case manager, testified that Mother was only minimally compliant with her objectives. *Id.* at 28. Therefore, to the extent that the trial court terminated Mother's parental rights on evidence separate and apart from the parenting capacity evaluation, we reject Mother's claim.

In her second issue, Mother argues that the trial court erred when it denied her counsel the opportunity to refresh her recollection with a discharge report relating to her alleged knee surgery. We disagree.

Evidentiary rulings are likewise "committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law." *Tillery v. Children's Hospital of Philadelphia*, 156 A.3d 1233, 1243 (Pa. Super. 2017) (citation omitted). Pennsylvania Rule of Evidence 612 provides that a witness's memory may be refreshed with a writing or other item. Pa.R.E. 612(a). In *Commonwealth v. Proctor*, 385 A.2d 383, 385 (Pa. Super. 1978), this Court held that a proper foundation must first be established before a party may avail himself or herself of the rule permitting a witness to refresh his or her recollection. Specifically, we held,

> [t]o permit the use of a writing in order to refresh the memory of a witness, the proponent must show: (1) that the witness'[s] present memory is inadequate; (2) that the writing could refresh the witness'[s] present memory; and (3) that reference to the writing actually does refresh the witness'[s] present memory.

*Id.* (citation omitted).

Here, during her direct testimony, Mother testified that she had knee surgery at Einstein Hospital in October of 2017, even though the termination hearing occurred before then, on September 28, 2017. N.T., 9/28/17, at 72-73. The trial court interrupted Mother's testimony as follows.

> THE COURT: She said she had the surgery October 2017[.] [T]his is September 28, 2017.
>
> [Mother's counsel]: Right, that was the knee surgery.
>
> THE COURT: She said October 2017. This is September 28, 2017.
> . . .

*Id.* at 72. Mother's direct examination continued:

> [Mother's counsel]: Can you repeat the date that you had your knee surgery?
>
> [Mother]: October of 2017. . . .
>
> [Mother's counsel]: Where did you have your surgery?
>
> [Mother]: Einstein.

*Id.* at 72-73. Thereafter, Mother's counsel attempted to show Mother a discharge report "to refresh her recollection in terms of where her surgery was done, and the last date she visited the hospital." *Id.* at 74. DHS's counsel objected, and the trial court sustained it without explanation. *Id.* at 73-74.

DHS responds in its brief, which the GAL joined, that the trial court did not commit an error of law because Mother's counsel failed to lay a proper foundation. We agree insofar as Mother's counsel did not present an offer of

proof that the discharge report could refresh Mother's present memory regarding the date of the knee surgery, and that it actually did refresh her present memory regarding the date of the surgery. Without this offer of proof, we cannot discern what effect, if any, the discharge report would have had. *See Commonwealth v. Flis*, 535 A.2d 157, 159-160 (Pa. Super. 1987) (discussing the need for an offer of proof to preserve the record for an adverse evidentiary ruling). Even if the trial court erred in not permitting Mother to refresh her recollection through the discharge report, we would conclude that the error was harmless in light of the competent record evidence supporting the involuntary termination of Mother's parental rights. Therefore, Mother's second claim fails.

With respect to her third issue, whether the trial court abused its discretion and/or erred in not giving her a reasonable amount of time to complete her family service plan objectives, Mother omits any discussion of this issue in the argument section of her brief. Therefore, we conclude that it is waived. *See Giant Food Stores, LLC v. THF Silver Spring Development, L.P.*, 959 A.2d 438, 444 (Pa. Super. 2008) ("The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. Failure to do so constitutes waiver of the claim.") (citations omitted); Pa.R.A.P. 2119(b).

In her fourth issue, Mother asserts that the trial court abused its discretion and erred in suspending her visits with A.M.S. when there was no evidence presented that she posed a grave threat to him.[8] This claim fails for the following reasons.

The record demonstrates that the trial court suspended Mother's visitation by the permanency review order entered on December 8, 2016. DHS Exhibit 5. Thereafter, the court directed that Mother's visitation remain suspended in the permanency orders entered on February 23, 2017, and May 18, 2017. *Id.*

This Court has held that orders suspending a parent's visitation are final and appealable. *See In re C.B.*, 861 A.2d 287, 289 n. 1 (Pa. Super. 2004) (concluding that the order suspending the father's visitation was a final, appealable order pursuant to *In re H.S.W.C.-B.*, 836 A.2d 908, 911 (Pa. 2003), which held, "An order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when

---

[8] The standard against which visitation between parents and their dependent children is measured depends upon the goal mandated in the family service plan. *See In re C.J.*, 729 A.2d 89 (Pa. Super. 1999). Where the permanency goal is reunification, a court may not deny or reduce visitation unless it poses a grave threat to the child. *Id.* at 95. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child. *Id.* However, where the goal is no longer reunification, the court may suspend, limit, or deny visitation if it is in the best interests of the child. *Id.* ("The 'best interests' standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard.").

entered."). Nevertheless, Mother did not file notices of appeal from any of the permanency orders suspending her visitation with A.M.S. Likewise, as discussed *supra*, Mother did not file a notice of appeal from the goal change order that the court issued at the conclusion of the subject proceeding. As such, Mother's issue regarding the suspension of her visitation rights is untimely and improper. Even if Mother properly raised the issue, we would deem it moot based on our disposition of this appeal. ***See In re D.A.***, 801 A.2d 614, 616 (Pa. Super. 2002) (stating, "An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citations omitted).

In her fifth and final issue on appeal, Mother asserts that DHS failed to prove by clear and convincing evidence that her conduct warranted termination pursuant to Section 2511(a)(1), (2), and (5). In the alternative, Mother asserts that DHS did not satisfy its burden of proof with respect to Section 2511(b).

> We are guided by the following standard:
>
> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. We have explained as follows.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Section 2511(a)(1), (2), (5), and (b) provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

. . .

23 Pa.C.S. § 2511(a)(1), (2), (5), (b).

DHS and the GAL respond in their brief that this issue is waived because Mother did not raise it in her concise statement of errors complained of on appeal. It is well-established that any issues not raised in a Rule 1925(b) statement are waived on appeal. *See In the Interest of G.D. v. D.D.*, 61

A.3d 1031, 1036, n. 3 (Pa. Super. 2013) (citing **Dietrich v. Dietrich**, 923 A.2d 461, 463 (Pa. Super. 2007).

Mother, through court-appointed trial counsel, timely filed and served a concise statement of errors complained of on appeal along with a notice of appeal on October 25, 2017, in accordance with Pa.R.A.P. 1925(a)(2)(i) and (b). In the concise statement, Mother asserted seven errors by the trial court, none of which involved Section 2511(a) or (b).

However, attached to Mother's appellate brief is a document entitled, "1925 A Statement of Matters Complained of on Appeal," which includes ten asserted errors. New appellate counsel, Attorney D'Adamo, attempts by this document to supplement the concise statement by raising additional errors relating to Section 2511(a)(1), (2), (5), and (b).[9]

This document is neither dated nor signed by Attorney D'Adamo. In fact, it does not reference any name or address of counsel. Moreover, this document is not time-stamped, and it does not include a certificate of service. Indeed, the certified docket does not reveal that Attorney D'Adamo filed a supplemental concise statement or requested to do so *nunc pro tunc*. Likewise, he did not request in this Court to file a supplemental concise

---

[9] We observe that this document asserts only in general terms that the trial court erred in terminating Mother's parental rights pursuant to 2511(a)(1), (2), (5), and (b). **See** Pa.R.A.P. 1925(b)(4) (providing, "The Statement shall concisely identify each ruling or error that the appellant intends to challenge **with sufficient detail to identify all pertinent issues** for the judge. . . ." (emphasis added).

statement *nunc pro tunc*.  Therefore, we agree with DHS and the GAL that

Mother has not preserved her final issue for appeal.  **See** Pa.R.A.P. 1925(b)(2)

(providing, "On application of the appellant and for good cause shown, the

judge may . . . permit an amended or supplemental Statement to be filed.  .

. .  In extraordinary circumstances, the judge may allow for the filing of a . .

. amended or supplemental Statement *nunc pro tunc*."); Pa.R.A.P. 1925(c)(2)

(providing, "Upon application of the appellant and for good cause shown, an

appellate court may remand in a civil case for the filing nunc pro tunc . . . for

amendment or supplementation of a timely filed and served Statement and

for a concurrent supplemental opinion.").

Even if Mother had preserved this issue, we would agree with DHS and

the GAL that it is meritless.  Competent record evidence demonstrates that

the trial court properly terminated Mother's parental rights pursuant to Section

2511(a)(2) and (b).[10]

To satisfy the requirements of Section 2511(a)(2), the moving party

must produce clear and convincing evidence regarding the following elements:

_____

[10] We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm.  **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  Therefore, we need not consider Mother's arguments with respect to Section 2511(a)(1) and (5). However, we observe that the trial court improperly terminated Mother's parental rights under Section 2511(a)(5) because A.M.S. was not removed from her care but from Father's care.  **See In re C.S.**, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.*

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Instantly, the CUA case manager, Ms. Riddick, testified that Mother "is always very combative whenever I speak to her. . . ." N.T., 9/28/17, at 30. She testified, "Mother has stated on several occasions that she does not want me to contact her. . . ." *Id.* at 31.

Ms. Riddick testified that Mother was only minimally compliant with her single case plan objectives. *Id.* at 28. Specifically, she testified that Mother did not participate in all of the requested random drug screens, and she did not consistently attend drug and alcohol treatment, which was required three times per week. *Id.* at 25-27. In fact, on the date of the termination proceeding, Mother had not attended her drug and alcohol treatment for the past three weeks, at minimum. *Id.* at 27. In addition, Ms. Riddick testified that Mother's drug and alcohol counselors concluded that Mother is dependent upon opiates, for which she has prescriptions due to alleged shoulder and knee surgeries. *Id.* at 32-33, 71-72.

Further, Ms. Riddick testified that Mother was referred to the Sage program in May of 2017, which is for parents of sexually molested children. *Id.* at 25. Mother was due to start the program in June, and she was subsequently discharged for non-attendance. *Id.* at 25. Significantly, Ms. Riddick testified that Mother does not consistently acknowledge that Father molested A.M.S. *Id.* at 32.

Mother testified on direct examination that she did not attend her appointments with the Sage program for the following reasons.

I called the first time, and informed them that I was not able to make it because of the bad weather[.] [T]he second time I called, I believe it was the exact same reason for very bad weather which I cannot move good in bad weather because of my surgeries. And the third time when I called they said because I missed two sessions I was not able to participate in the third one, and I would have to wait until September [of 2017] for the next class to start.

*Id.* at 75. Ms. Riddick testified that Mother did not attend the September of 2017 appointment because Mother stated she "was out of town." *Id.* at 25.

On cross-examination by the GAL, Mother testified as follows.

Q. I think you said you go to work every day?

A. I work every day, yes, I do.

Q. And you're not incapacitated by your shoulder surgery?

A. I work from home.

Q. And you said you work every day; is that right?

A. Yes, I do.

Q. And you've been able to work in spite of your shoulder surgery and your knee surgery?

A. I work from home, yes.

Q. And you had the shoulder surgery on May 12, 2017; is that right?

A. Yes.

Q. And we were in court on May 18 of 2017, and you were here; isn't that right?

A. Yes, it was.

Q. Yet you were not able to go to the Sage appointment following the [c]ourt hearing because of your shoulder; is that right?

A. The rain, it was bad weather that day and after having surgery I don't move around as well, I can't move around as well.

Q. But you're still able to travel to work and travel to Detroit;[11] is that right?

A. Good weather conditions, yes. And also it's necessary for my success with my business that I travel those every three months[.] [I]t's mandatory in order for me to succeed.

*Id.* at 86-87.

Based on the foregoing, we conclude that the testimonial evidence supports the trial court's involuntary termination of Mother's parental rights pursuant to Section 2511(a)(2). Mother's repeated and continued refusal to consistently participate in random drug screens, the requisite drug and alcohol treatment program, and the Sage program, has caused A.M.S. to be without essential parental care, control, and subsistence necessary for his physical and mental well-being. Further, the causes of Mother's refusal to participate in these programs cannot or will not be remedied.

With respect to Section 2511(b), we are governed by the following settled case law.

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The

---

[11] Mother testified that approximately two weeks before the termination proceeding, on a Monday, she returned from Detroit. N.T., 9/28/17, at 69. She testified, "I have my own business, and we travel every three months, so, I was in Detroit for intensive training." *Id.* There are no details in the record regarding Mother's alleged business.

mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In this case, there is no evidence of a parent-child bond between Mother and A.M.S. Indeed, Father assumed custody of A.M.S. in August of 2016. In September of 2016, the court placed A.M.S. in the custody of DHS, when he was three years old. Further, Mother's visitation with A.M.S has been suspended since the permanency review order in December of 2016. Therefore, it was reasonable for the trial court to infer that no bond exists.

Ms. Riddick testified that A.M.S. "appears extremely bonded to the current foster parent. He calls her mother. . . . [He] is doing extremely well in the home. . . ." N.T., 9/28/17, at 29. Ms. Riddick explained that A.M.S. is in a treatment foster home because of behavioral problems. *Id.* at 23. However, she testified that his behavior "has been stabilizing as of June of this year." *Id.* at 23-24. In addition, Ms. Riddick testified on direct examination as follows.

> Q. Do you believe it would be harmful to [A.M.S.] in light of his current status if [M]other's parental rights were terminated by the [c]ourt?
>
> A. No.
>
> . . .
>
> Q. Do you have concerns that his behaviors may . . . destabilize[] if he was removed from the [foster] home?
>
> A. Yes.

*Id.* at 28-29.

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the trial court pursuant to Section 2511(b). The evidence

- 21 -

demonstrates that terminating Mother's parental rights will serve the developmental, physical and emotional needs and welfare of A.M.S. Accordingly, we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/1/18